The COCA–COLA COMPANY, Appellant,

v.

The SEVEN–UP COMPANY, Appellee.
Patent Appeal No. 74–513.

United States Court of Customs and Patent Appeals.
June 20, 1974.

Julius R. Lunsford, Jr., James W. Young, III, Atlanta, Ga., attys. of record, for appellant.

Kane, Dalsimer, Kane, New York City, attys. of record, for appellee. Philip T. Dalsimer, Siegrun D. Kane, New York City, J. Stewart Bakula, Robert J. Eck, St. Louis, Mo., of counsel.

Before MARKEY, Chief Judge, RICH, BALDWIN and MILLER, Judges, and ALMOND, Senior Judge.

MARKEY, Chief Judge.

This is an appeal from the decision of the Trademark Trial and Appeal Board, 178 USPQ 309 (1973), adhered to on reconsideration, dismissing the opposition of appellant to the registration by appellee of THE UNCOLA [1] for soft drinks. Appellant relied, inter alia, on registrations of its well-known mark COCA–COLA.[2] We affirm.

The opinion of the board sets out the massive volume of use and advertising of COCA–COLA and THE UNCOLA. No question of priority of use is involved, appellant having begun use of its mark more than three-quarters of a century prior to appellee's first use of the mark sought to be registered.

## OPINION

The sole controlling issue is whether THE UNCOLA is merely descriptive of soft drinks.[3] We think not.

---

1. Serial No. 350.618 filed February 5, 1970, alleging first use on December 20, 1967.

2. Registration Nos. 22,406 (January 31, 1893, renewed December 5, 1922; November 10, 1942; and January 31, 1963), 47,189 (October 31, 1905, renewed June 16, 1925; July 31, 1945; and October 31, 1965, republished under Section 12(c), Act of 1946, March 8, 1955), 238,145 (January 31, 1928, renewed January 20, 1948, republis·.ed under Section 12(c), Act of 1946, December 14, 1948), and 238,146 (January 31, 1928, renewed January 20, 1948, republished under

Section 12(c), Act of 1946, December 14, 1948).

3. Appellant raises numerous additional contentions which are either unfounded or irrelevant:

(a) *Likelihood of confusion.* We find THE UNCOLA and COCA–COLA clearly distinguishable. The evidence, including appellee's pre-trial depositions if admissible, is insufficient to establish that COCA–COLA is known by *consumers* as "THE COLA." If it were, that fact would not aid appellant. Confusion would

The record establishes that the notation, THE UNCOLA, did not exist, in dictionaries or anywhere else, until it was coined by appellee.[4] Appellee's expert lexicographer, Professor Hubbel, testified without challenge that the mark was created in a manner contrary to normal English language construction. The combination of "un" with a noun, such as "book," "desk" or "cola" would violate an English-speaking people's sense of idiom. Professor. Hubbel testified that the natural term descriptive of a soft drink not of the cola variety would be "non-cola." Appellant's own witnesses and exhibits from the trade press confirm that "non-cola" is the only term ever used in the industry to describe or refer to a soft drink not of the cola variety. Unlike purchasers in the marketplace, appellant dissects the mark, arguing that "un" means "non." We have said, so often as not to require citation of authority, that marks must be viewed as the public sees them, i. e., in their entireties. In the present case, the record is devoid of evidence that the buying public would employ the scalpel technique envisioned by appellant.

Though appellant produces many soft drinks not of the cola variety, and had searched its historical records back to the 1880's, the record contains not a single use, by appellant or by anyone else, of "uncola" prior to the coining and use of THE UNCOLA by appellee. The language employed in describing the mark involved in Vita-Var Corp. v. Alumatone Corp., 83 F.Supp. 214, 215 (S.D.Cal., 1949)—"a combination which has enough deviation from the common use of words and parts of words to make its registration as a trade mark valid"—is equally applicable in the present case to THE UNCOLA.

Appellant devotes considerable argument to the proposition that more than one term may be descriptive of the same product. We fully agree. The board's decision does not rest, however, as appellant appears to assume, on the fact that "non-cola" is *a* common descriptive term for the product but on the fact that it is, on the record here, the *only* common descriptive term for that product. Appellant's difficulty lies in a total failure of the record to indicate that THE UNCOLA is or ever was merely descriptive of, or a common descriptive term for, the product.

Intertwined with appellant's characterizations of appellee's mark as "descriptive," appear allegations that THE UNCOLA is "generic" and a "common" descriptive term. We find not a scintilla of evidence in the record to support such allegations. On the contrary, the

---

not be likely between THE UNCOLA and THE COLA, which convey different ideas. In Procter and Gamble Co. v. Conway, 419 F.2d 1332, 57 CCPA 865 (1970), relied on by appellant, MR. STAIN, as used, conveyed the same idea and stimulated the same mental reaction as MR. CLEAN.

(b) *Appellee's massive advertising disparages cola-drinks and uses a particular script, red and white colors, a red disk, a fountain glass and "The Pause That Refreshes," constituting unfair competition and aggravating confusion.* Appellee's right to registration is all that is before us. The White Co. v. Vita-Var Corp., 182 F.2d 217, 37 CCPA 1039 (1950). Appellee's advertising program is not on trial. There is no statutory basis for allegations of product disparagement or unfair competition as bases for refusal of registration. Confusion being unlikely, there is nothing to be "aggravated." Disparage-

ment and unfair competition being matters for another forum and irrelevant herein, we make no findings thereon.

(c) *The board erred in striking appellant's notice of reliance on certain testimony, in refusing to take judicial notice of late-submitted third-party advertising, and in considering appellee's survey evidence.* We find no error on the part of the board in any of these rulings. In our view of the case, moreover, the result would not be affected if the board had ruled differently on any or all of these questions.

4. Compare UNBURN, against which an opposition was dismissed, even though archaic uses thereof appeared in dictionaries in 1933 (but not subsequently) and opposer had used it sporadically in advertising before abandoning it. Norwich Pharmacal Co. v. Chas. Pfizer & Co., Inc., 165 USPQ 644 (TTAB 1970).

record clearly establishes that UNCOLA is so non-generic and non-common as to have been used by no one, for any purpose, other than as an indication of a product of appellee's manufacture.

The board's opinion, as appellant emphasizes, includes a statement that THE UNCOLA "possesses a descriptive connotation." Appellant's brief improperly refers to that statement as " * * * the Board's ruling that 'THE UNCOLA' was descriptive." Of course the board made no such "ruling." We interpret the board's phrase, "descriptive connotation," to mean that the mark conveys an impression that appellee's product is not a cola. That may be true, but not fatal. The simple presence of that type of descriptive "connotation," like the presence of suggestiveness, will not preclude registration where the mark is not merely descriptive of the goods.

Appellant attacks the board's statement that THE UNCOLA had acquired a secondary meaning, indicating a product of appellee's manufacture. The first ground of attack, without citation of authority, is based on appellee's not having filed its application under Section 2(f) of the Act. The attack must fail. Because the examiner had never raised a question of descriptiveness and appellee never considered its mark to be descriptive, there was no reason to have filed under Section 2(f) or to have amended the application to bring it under that section. Moreover, appellant appears to have forgotten that the issue was raised by appellant's *own* allegation that the mark did not function as a "badge of identification" of appellee's goods. Appellee met that allegation by competent evidence, even if appellee's survey-type evidence be

disregarded.[5] The board properly considered all of the probative evidence in rendering its decision.

Appellant's second attack on the board's finding of secondary meaning is based on appellant's survey indication that the *public* uses THE UNCOLA infrequently in ordering appellee's product.[6] The board correctly pointed out, however, that use by purchasers is not essential in establishing secondary meaning, particularly where a well-known mark, such as 7-UP, is available. We would add that many marks, including slogans and designs, are perfectly valid trademarks though their nature virtually precludes their use in ordering the goods with which they are associated.

The last attack on THE UNCOLA as identifying origin (secondary meaning) is that, regardless of the market situation, the mark could not become the exclusive property of appellee because it is generic. Having presumed the mark to be generic, appellant argues that any secondary meaning is merely *de facto* and hence incapable of supporting registration. Because we hold the mark herein to be non-generic, appellant's presumption that the mark is generic, and the argument predicated thereon, must fall.

We see no need to determine the presence of secondary meaning herein.[7] The word "secondary" in the phrase "secondary meaning" does not mean lesser in importance. Because a secondary meaning in this context is an acquired meaning, it is necessarily created later in time. It is created in a new environment, namely the marketplace, where its "secondary" meaning is of "primary" importance. The judicially developed concept of "secondary mean-

---

5. In addition to the evidence of appellee's pervasive advertising program, appellant's own witnesses Corbani and Boyd testified that THE UNCOLA is associated only with appellee and some of the people interviewed in appellant's own survey associated THE UNCOLA only with appellee.

6. A rare use by the public of THE UNCOLA argues against consideration of the mark as

"generic" or as "the common descriptive term" for the product.

7. If *de jure* secondary meaning were required, we agree with the board that abundant evidence exists in the record to establish it.

ing," expressed in Section 2(f) as "has become distinctive," relates to a term which had earlier served only to describe or to locate geographically or as a surname. At that time such a term would not be registrable, in view of the prohibitions of Section 2(e). At some later time, the term may *become* distinctive of a seller's goods in commerce and, as such, become registrable under the provisions of Section 2(f). It is said that such a term has acquired a "secondary meaning," i. e., a "marketplace meaning," which is an indication of origin of the goods with which the term is associated in the marketplace. In the present case, THE UNCOLA has never served only to describe. From its origin, the mark was used only in connection with appellee's product to distinguish it (as to source) from the products of others. No question of "secondary meaning" arises in such a situation.

In summary, the record clearly establishes that THE UNCOLA was coined by appellee, has never been used by anyone else for any purpose and is not merely descriptive of soft drinks. The decision of the board must therefore be affirmed.

Affirmed.