ENGINEERED MECHANICAL
SERVICES, INC.

v.

APPLIED MECHANICAL TECHNOLO-
GY, INC., et al.

Civ. A. No. 81–663–A.

United States District Court,
M.D. Louisiana.

April 11, 1984.

Bert K. Robinson, Wray, Robinson & Kracht, Baton Rouge, La., for plaintiff.

Carey J. Guglielmo, Owen, Richardson, Taylor, Mathews & Atkinson, Baton Rouge, La., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN V. PARKER, Chief Judge.

This action is brought by Engineered Mechanical Services, Inc. (EMS), a Louisiana corporation (formerly known as "The Me-

talock Corporation") and Metalock Corporation (Metalock Corp.) an Illinois corporation, asserting trademark and service mark infringement under the Lanham Act, 15 U.S.C. § 1114(1). This court has jurisdiction under 15 U.S.C. § 1121 and 28 U.S.C. § 1338. Defendants are Gonzales Machine, Inc. (Gonzales) a Louisiana corporation, Gerald D. Whitehouse (Whitehouse) a Louisiana citizen and Applied Technology, Inc. (AMTEC) a Louisiana corporation. While certain pendent state law claims were also asserted in the original complaint, the court has dismissed all of them because of pending state court litigation between the same parties. Only the federal trademark claims remain.

Plaintiff, Metalock Corporation, is the registered owner of the trademark METALOCK, registered on May 3, 1938 for "METALIC RODS AND ELEMENTS FOR REPAIRING CRACKED OR BROKEN CASTINGS OF STEEL, IRON OR OTHER METAL," renewed on May 3, 1958 and renewed again on May 3, 1978. Plaintiff, Metalock Corp., is also the registered owner of the service mark "METALOCK" registered November 4, 1980, for MACHINERY AND CASTING REPAIR SERVICES." Plaintiff, EMS, holds a license from Metalock Corporation for both marks. Plaintiff, Metalock Corporation, also owns the trademarks MASTERLOCK and METALACE which, all concede, defendants have not used and are not at issue in this litigation.

Plaintiffs assert that defendants have infringed their marks. The defendants' assert a variety of defenses, including that the term METALOCK is or has become a generic term and thus it is not entitled to registration, that METALOCK is merely descriptive and that the defendants have used the term only in a descriptive manner and are entitled to assert the "fair use" defense, that plaintiffs have abandoned the marks and that likelihood of confusion has not been shown. Defendants also originally claimed that the manner of use by the plaintiffs violated the anti-trust laws of the United States but, since they offered no

evidence in support of that claim and make no mention of it in post-trial brief, it is considered abandoned.

The term METALOCK was coined, or at least used and registered, by one Lawrence B. Scott to identify a process for repairing cracked or broken machinery or castings, as well as to identify the metal bars or fasteners used as "locks." As set forth in a 1946 brochure used by Scott's company, the mark is shown as follows:

**METALOCK** is the term used to describe specially formed locks or keys made of special alloys. The size and number of METALOCKS used vary with conditions and the amount of strength to be restored to the fractured metal. Slots are cut transverse to the fracture and METALOCKS are inlaid by cold working into the parent metal. Thus, the locks hold cracked or broken pieces together and restore strength to fractured sections.

The brochure continues:

### WHAT IS METALOCK?

THE METALOCK PROCESS IS A METHOD OF MAKING COLD REPAIRS ON CRACKED, BROKEN OR WEAKENED MACHINE PARTS OR PRESSURE VESSELS OF CAST OR FORGED METALS. THE DIFFERENT TECHNIQUES USED IN METALOCK ARE DESCRIBED AND ILLUSTRATED BELOW.

The brochure then depicts METALOCK.

METALOCK

The evidence admitted at the trial shows that Scott, his licensees and successors have consistently used the mark METALOCK in the manner depicted above, both to identify the process of making cold repairs and to identify the fasteners or locks. The evidence also shows a rather consistent utilization of terms such as "Metalocked" and "Metalocking" in advertising brochures.

Some history of the mark and the process will be useful to an understanding of the issues in the litigation.

A man named Hal W. Harmon operated in the 1930's, a shop in El Paso, Texas where he practiced the sealing of cracks and broken castings. He had several agents in the field, one of whom was Scott. Scott was employed by Harmon from 1935 to 1937. In late 1936 or early 1937, Harmon devised a lock or "fastening" for which he applied for a patent on August 7, 1937. Patent No. 2,142,896 was ultimately issued to Harmon. Scott applied for a patent on June 30, 1938 and on April 2, 1940, Patent No. 2,195,741 was issued to him covering a method of repairing cracked or broken metallic bodies utilizing a thick metal locking bar.

Scott went into business for himself and ultimately established agents or licensees throughout the United States. The term METALOCK was consistently used in conjunction with the advertising and sale of products and services by these agents or licensees. Virtually all of Scott's agents or licensees are persons who initially worked for him and learned the process. All apparently entered agreements with Scott relative to use of the term METALOCK. Scott operated businesses in Houston, Columbus, Ohio and Long Island City, New York known as "Metalock Casting Repair

Service" and by 1946 he had more than thirty-five independent agents or licensees all of whom were utilizing the mark ME-TALOCK. One of Scott's agents was Fred C. Williams in Crowley, Louisiana. In about 1957, one Chester Harris, who had been employed by Scott in Houston, joined Williams in partnership operating under the name "Metalock Casting Repair Service" in Crowley. Thereafter, Harris moved to Baton Rouge in 1958 and established a business known as "Metalock Casting Repair Service." Subsequently this business was incorporated under the name "The Metalock Corporation" and subsequently the name was changed to "Engineered Mechanical Services, Inc." That business is now operated by Cleon Harris, the son of Chester Harris. Harmon and Scott each received additional patents closely related to their initial patents and Harmon eventually filed suit against Scott alleging patent infringement. In *Harman v. Scott*, 90 F.Supp. 486 (S.D.Ohio 1950), aff'd, 195 F.2d 916 (6th Cir.), *cert. denied*, 343 U.S. 965, 72 S.Ct. 1059, 96 L.Ed. 1362 (1952) the district court held:

> The Court is of the opinion and so finds that the defendant's accused device (or devices) does the same work in substantially the same way and accomplishes substantially the same result as the device or "Fastening" of the patent in suit and that therefore, it (or they) does infringe Claims 1 and 2 here in issue, of Patent No. 2,142,896.

(90 F.Supp. at 492)

The only issue involved in that litigation was a claim of patent infringement and, although the Scott patent No. 2,195,741 was referred to, its validity was not adjudicated. There were no trademark issues involved in that litigation.

There is evidence which strongly indicates that following the litigation many of Scott's agents or licensees discontinued royalty payments under the assumption that his patent had been declared invalid.

The evidence establishes, however, that Scott and his agents or licensees continued to utilize the mark METALOCK to identify the cold metal repair process which they were marketing throughout the United States. One of Scott's agents or licensees was Fred Lewis who operated a business known as "Metalock Casting Repair Service" in Chicago, Illinois. After Scott's death, Mr. Lewis's son, William Lewis, who then controlled the Chicago business, purchased from Scott's widow the Long Island City Repair business and all of the trademark rights to the mark METALOCK. That Chicago business is now known as the Metalock Corporation and is controlled by Mr. William Lewis. The Metalock Corporation has acquired or merged with several other businesses throughout the country which were agents or licensees (at that time or formerly) of Scott, including Metalock Casting Repair Service of Columbus, Ohio, SE Moine Engineering Co. in Detroit, Michigan and Mech-Lock of St. Louis, Missouri.

Ronald D. Hoover is the majority shareholder and president of the defendant Gonzales. The defendant Whitehouse, a mechanical engineer, has served as a consultant to EMS and from May 1975 until July 31, 1976, was employed full time by EMS. There he became fully familiar with the METALOCK process. Since 1979 he has been a consultant for Gonzales. AMTEC was incorporated in 1980 by Whitehouse and is controlled by him. It provides consulting services and the president of Gonzales, Hoover, and two of its vice presidents are shareholders in AMTEC. Gonzales has hired a number of former EMS employees, all of whom were familiar with the METALOCK process and utilization of that mark by EMS. One of those former EMS employees, Breaux, testified by deposition, that Mr. Hoover specifically hired another EMS employee because he was familiar with EMS's customer list and he wanted to cut into EMS's market by systematically attempting to undercut EMS on price. At first Gonzales did not use the term METALOCK but the evidence shows that it now frequently uses that term both in a descriptive sense, "metalocking," "metalocked," "metalocks," as well as in a

trademark sense as "Metal-locking" or "Metalock."

Since 1970 the plaintiff Metalock Corp. has spent some three hundred to five hundred thousand dollars in advertising the mark METALOCK. Metalock Corp. has sold twenty to twenty-five million dollars worth of goods and services between 1970 and 1982 all in association with the mark METALOCK. Its major competitors are Westinghouse Corporation, Worthington, In Place Machinery, and Reynolds & French.

Defendant Gonzales is located in Gonzales, Louisiana. According to its brochure it provides engineering services through AMTEC, machining services, coatings and spray arc facilities, "Metal-Locking Repairs for Castings and Forgings" and fabrication of pressure vessels. The "Metal-Locking" services are described as:

> Gonzales Manufacturing engages in the permanent repairs for all types of equipment failures. This activity utilizes their subsidiary Applied Mechanical Technology, Inc. (AMTEC) for all engineering repair design.

> Design repairs for equipment failures are considered after a detailed engineering analysis as to the probable cause of failure. Repair techniques are dictated by the materials and their required strength, extent of damage, geometry, accessibility and economics. Metal-locking repairs are designed and dictated by the location of the damage, metalurgy and physical properties of the casting and strengths required to sustain operating forces and temperatures. We have personnel with many years of experience in the Metal-Locking process.

This is precisely the type of service performed by plaintiff EMS in the Baton Rouge area. Gonzales serves the petrochemical industry in the Baton Rouge area, as does EMS. Common customers include Exxon, Shell, Texaco, Crown-Zellerbach and Louisiana Power & Light. Defendants readily concede that they have used variations of METALOCK regularly beginning in March 1980. They further concede, as they must, that registration of the mark constitutes prima facie evidence of plaintiff's exclusive right to use the mark in commerce, 15 U.S.C. § 1115(a) and, since more than five years have passed since registration of the mark, it has become incontestable, 15 U.S.C. § 1065, which means that only limited defenses are permitted, 15 U.S.C. 1115(b) and that the burden of proving those defenses is upon the defendants. In effect registration shifts the burden of proof from the plaintiff to the defendant who must introduce sufficient evidence to rebut the presumption of plaintiff's right to exclusive use of the registered mark. *American Foods, Inc. v. Golden Flake, Inc.*, 312 F.2d 619 (5th Cir. 1963); *Anti-Monopoly, Inc. v. General Mills Fun Group*, 684 F.2d 1316 (9th Cir. 1982), *cert. denied*, 459 U.S. 1227, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983) Anti-Monopoly II. The burden is nevertheless on plaintiff, in the first instance to show likelihood of confusion. *Sun Banks of Florida, Inc. v. Sun Federal Savings & Loan Association*, 651 F.2d 311 (5th Cir.1981); *American Foods, Inc. v. Golden Flake, Inc.*, 312 F.2d 619 (5th Cir.1963).

Since plaintiffs and defendants are both engaged in this same type of repair services in the same trade area and both use the trademark METALOCK to identify and describe such services, it is apparent that there is a likelihood of confusion.

### GENERIC–DESCRIPTIVE–SUGGESTIVE–FANCIFUL

The first and most vigorously urged defense is that Metalock is or has become a generic term for a type of cold repair process for cracked metal and hence is not properly subject to registration. Closely allied is the alternative position that, if not generic, Metalock is merely descriptive, that it has not acquired a secondary meaning and hence may not be appropriated exclusively by the plaintiffs.

Properly characterizing a particular mark is more often easier said than done. As the court put it in *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 796 (5th Cir.1983):

Courts and commentators have traditionally divided potential trademarks into four categories. A potential trademark may be classified as (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful. These categories, like the tones in a spectrum, tend to blur at the edges and merge together. The labels are more advisory than definitional, more like guidelines than pigeonholes. Not surprisingly, they are somewhat difficult to articulate and to apply.

698 F.2d at 790 (citation omitted); *see also Sun Banks of Florida, Inc. v. Sun Federal Savings & Loan Association*, 651 F.2d 311, 315 (5th Cir.1981); *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1183–84 (5th Cir.1980), *cert. denied*, 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981).

In *Vision Center v. Opticks, Inc.*, 596 F.2d 111 (5th Cir.1979), *cert. denied*, 444 U.S. 1016, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980), the court noted that, "[a]lthough these categories are meant to be mutually exclusive, they are spectrum-like and tend to merge imperceptibly from one to another," and further explained the terminology:

A generic term is the name of a particular genus or class of which an individual article or service is but a member. Most courts hold that a generic term is incapable of achieving trade name protection. A descriptive term identifies a characteristic or quality of an article or service and, though ordinarily not protectable, may become a valid trade name if it acquires a secondary meaning. A suggestive term suggests, rather than describes, a characteristic of the goods or services and requires an effort of the imagination by the consumer in order to be understood as descriptive. A suggestive term requires no proof of secondary meaning in order to receive trade name protection. An arbitrary or fanciful term bears no relationship to the product or service and is also protectable without proof of secondary meaning.

596 F.2d at 115 (citations omitted).

One of the better known generic marks is "Shredded Wheat," held to be generic for a class of cold breakfast food in *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938). As one author comments:

There is unnecessary confusion over the distinction between "generic" and "descriptive." A generic term is any one which embraces a group of products or services not necessarily limited to those of one producer. The typical generic term is a noun which is one of the common terms which language provides for designating (i.e., naming) products or services without regard to the identity of the seller. For example, "automobile" is a generic term because it applies equally well to any brand of automobile. Even if at the moment, perhaps because of a dominating patent, there happened to be only one producer of automobiles, it would still be a generic term, capable of embracing any other brand of automobile which should appear on the scene, because the word "automobile' is brand-neutral.

3 R. Callmann, *The Law of Unfair Competition, Trademarks and Monopolies* § 18.-03, at 8 (4th ed. 1983) (footnotes omitted).

■ While the mark METALOCK may have been the "top of the line Cadillac brand" of cold repair service at the time it was registered by Scott, I find as a fact that it was not generic of all such cold repair services.

■ That does not end the inquiry, however. Under 15 U.S.C. § 1064(c), if at any time a registered mark becomes generic as to a particular product or service, the registration is subject to cancellation. Thus Dupont's brand, "cellophane," was so successful and widely accepted by the public that it came to be generic for all transparent cellulose film, as was Bayer's brand of acetyl salicylic acid—"aspirin," *Bayer Co. v. United Drug Co.*, 272 F. 505 (S.D.N.Y. 1921) and the mark "thermos" for vacuum containers, *American Thermos Products Co. v. Aladdin Industries, Inc.*, 207 F.Supp. 9 (D.Conn.1962), *aff'd sub nom.*

*King-Seeley Thermos Co. v. Aladdin Industries, Inc.,* 321 F.2d 577 (2d Cir.1963). While "Monopoly" was not generic as to all real estate board games in the 1930's when it was first marketed, it eventually became so, despite the efforts of the owner of the mark. *Anti-Monopoly, Inc. v. General Mills Fun Group, Inc.,* 684 F.2d 1316, 1326 (9th Cir.1982), *cert. denied,* 459 U.S. 1227, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983).

Thus, we must determine whether ME-TALOCK has come to stand in the public mind for all cold metal repairs rather than those undertaken by Metalock Corporation and its licensees.

■ In support of this argument, defendants offered the testimony of two linguists, each of whom examined a number of sales brochures used by plaintiffs, defendants and others, one of whom also examined a number of internal Gonzales work orders, invoices, etc. Both experts found that Metalock was frequently used as a plural noun (Metalocks), a verb (Metalocked), or an adverb (Metalocking). One expert concluded that, as used, Metalocking was the name of a process analogous to "milling," "drilling," or "machining" and hence that it was generic. The other expert concluded that the term is descriptive at best and is probably generic.

Significantly, most of the documents examined by the witnesses were generated by the defendants themselves or by agents or former agents of Scott, who registered the term and licensed its use. There is evidence that others also undertake cold repairs to metal, using terms such as "Herculock," "Mech-Lock," "Cold Stitch," "Cast-A-Lok" and "Unilock." Defendants also called representatives from several local industries (all of whom had been customers of EMS—formerly the Metalock Corporation—and all of whom had been solicited by Gonzales) who generally testified that "Metalocking" is a type of cold metal repair and that when they desire to arrange for the repair of a piece of machinery or equipment they frequently refer to it as "Metalocking." In view of the long period of time that EMS has been providing METALOCK

brand casting repairs in the Baton Rouge area, their testimony is hardly surprising, nor is it particularly meaningful.

Despite the opinion of the experts, I find as a fact that METALOCK has been consistently used by plaintiffs in the trademark sense illustrated earlier in this opinion, as identifying the source of cold repair services provided by plaintiffs and as identifying the locks or fasteners utilized in making such repairs. Defendants have not proved that, to the general public, the mark METALOCK has come to stand for all cold metal repairs.

Defendants and their linguistic experts insist, however, that METALOCK is merely descriptive of the process—one "locks" two pieces of metal together—and hence it cannot be properly registered.

■ The term METALOCK, standing alone, does not describe anything except possibly a padlock. As applied to a specific process "of making cold repairs of cracked, broken or weakened machine parts or pressure vessels of cast or forged metals," it is suggestive, not descriptive. A suggestive term suggests, rather than describes, some particular characteristic of the goods and services to which it applies and it requires the consumer to exercise the imagination in order to draw a conclusion as to the nature of the goods or services. *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.,* 698 F.2d 786, 791 (5th Cir.1983). Some terms that have been held suggestive rather than descriptive are:

"Aerojet" for engines and other aircraft equipment. *Aerojet-General Corp. v. Jet-Aero Corp.,* 138 U.S.P.Q. pg. 557 (S.D.Fla.1963).

"Air Care" for maintenance program of medical equipment. *Airco, Inc. v. Air Products & Chemicals, Inc.,* 196 USPQ 832 (TTAB 1977).

"Allure" or "A'Lure" for brassieres, *Warner Brothers Co. v. Jantzen, Inc.,* 150 F.Supp. 531 (S.D.N.Y.1956), *affirmed,* 249 F.2d 353 (2d Cir.1957).

"Americana" for a hotel, *Tisch Hotels, Inc. v. Americana, Inc.,* 350 F.2d 609

(7th Cir.1965); *Tisch Hotels, Inc. v. Atlanta Americana Motor Hotel Corp.*, 254 F.Supp. 743 (N.D.Ga.1966).

"Caesar's Palace" for an opulent resort, *Caesar's World, Inc. v. Caesar's Palace, Inc.*, 179 USPQ 14 (D.Neb.1973).

"Cool" or "Kool" for a soft drink powder, *Chicago Dietetic Supply House, Inc. v. Perkins Products Co.*, 280 F.2d 155, 47 CCPA 1103 (C.C.P.A.1960).

"Coppertone" for a suntan product, *Douglas Laboratories Corp. v. Copper Tan, Inc.*, 210 F.2d 453 (2d Cir.) *cert. denied*, 347 U.S. 968, 74 S.Ct. 779, 98 L.Ed. 1109 (1954).

"Cyclone" for fencing, *United States Steel Corp. v. Cyclone Fence, Inc.*, 141 U.S.T.Q. 288 (N.D.Ohio 1964).

"Perma-Stone" for simulated stone facing, *Perma-Stone Co. v. Perma-Rock Products, Inc.*, 160 F.Supp. 616 (D.Maryland 1958).

"Everlasting and Evertight" for valves, *Everlasting Valve Co. v. Schiller*, 21 F.2d 641 (E.D.Penn.1927).

"Fancee Free" for women's underwear, *Fancee Free Mfg. Co. v. Fancy Free Fashions, Inc.*, 148 F.Supp. 825 (S.D.N.Y.1957).

"Frostie" or "Frosty" for soft drinks, *Frostie Co. v. Sun-Glo Packers, Inc.*, 315 F.2d 932, 50 CCPA 1160 (C.C.P.A. 1963); *Frostie Co. v. Dr. Pepper Co.*, 341 F.2d 363 (5th Cir.1965).

"Mr. Clean" for household cleaner, *Proctor & Gamble Co. v. Citrus Resources, Inc.*, 189 U.S.P.Q. 112 (T.T.A.B. 1975).

"Orange Crush" and "Lemon Crush" for soda pop, *Orange Crush Co. v. California Crushed Fruit Co.*, 297 F. 892 (D.C.Cir.1924).

"Playboy" for a magazine for men, *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.*, 486 F.Supp. 414 (S.D.N.Y.1980).

"Q-Tips" for cotton-tipped applicators, *Q-Tips, Inc. v. Johnson & Johnson*, 108 F.Supp. 845 (D.N.J.1952) aff'd, 206 F.2d 144 (3rd Cir.1953), *cert. denied*, 346 U.S. 867, 74 S.Ct. 106, 98 L.Ed. 377 (1953) and 347 U.S. 935, 74 S.Ct. 630, 98 L.Ed. 1086 (1954).

"Sunkist" or "Sun-Kist" for fruits, *California Fruit Growers Exchange v. Gonska*, 55 F.Supp. 499 (N.D.Ill.1943).

"Uncola" for noncola-flavored soda pop, *Coca-Cola Co. v. Seven-Up Co.*, 497 F.2d 1351 (C.C.P.A.1974).

While, as noted, METALOCK might be descriptive of a padlock, the word, standing alone, does not indicate a casting repair process. Almost no information about the process is conveyed by the term METALOCK; there is only a hint or suggestion that it probably has something to do with metals and security. The term requires that one exercise his imagination in order to draw a conclusion as to the actual nature of the goods and services rendered. Plaintiffs are not selling padlocks; they are selling a process of cold metal repair and as to those services, METALOCK is suggestive, not descriptive. METALOCK for cold metal repair services is at least as suggestive as is "Fancee Free" for women's underwear or any of the other examples listed above.

For this part of their argument, the defendants rely heavily upon the case of *Metalock Corp. v. Metal-Locking of Louisiana, Inc.*, 260 So.2d 814 (La.App. 4th Cir.), *cert. denied*, 262 La. 189, 262 So.2d 788 (1972), an action brought by plaintiff, EMS, under its former name against a company operated by a Mr. Borey who is also a former Scott employee. Borey established his business in the New Orleans area and used "Metalocking" in the name of his business as well as in the providing of cold medal repair services. EMS filed suit under Louisiana law for trademark infringement. The court held that, as between the two parties, neither had any better right to use the mark than the other since neither could show any assignment of rights from Scott. The court dismissed plaintiff's suit and further quoted the following finding of the trial judge:

With regard to the word "metalock," the Court finds that it is descriptive of a service rather than a commodity or arti-

cle of commerce. Additionally, the Court finds that the term is simply descriptive of a method of repair used on metal. Both parties agree that anyone is at liberty to perform the repair service so described.

260 So.2d at 821.

Since the actual holding of the court was that neither party was entitled to exclusive use of the mark, or the process, the gratuitous statement that METALOCK is descriptive, appears to be dictum. Whether considered necessary to the decision or not, however, I simply do not agree that METALOCK is descriptive as applied to a process or method for making cold repairs of cracked or broken metal castings. Defendants do not offer that decision as res judicata, nor could they, since the same parties are not involved, nor are the same issues involved. I find that case not controlling or persuasive.

### "FAIR USE"

■ Defendants next argue that their use of the mark METALOCK is a "fair use" in a non-trademark sense and that this type of use is permitted by 15 U.S.C. § 1115(b)(4). This defense is available only in actions involving descriptive terms and only where the term is used in its descriptive, rather than its trademark sense. *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 796 (5th Cir.1983) ("Fish-Fri", although descriptive had acquired a secondary meaning in the New Orleans area but the plaintiff could not prevent competitors from using "fish-fry" to describe the coating mix they sold).

■ This defense is also insufficient. The mark METALOCK is not descriptive, but suggestive, and the defense of "fair use" is not available. Moreover, the evidence in this case shows that defendants' use has been in the trademark sense. Defendants have used the word in capital letters and have otherwise made it prominent in their advertising brochures. The evidence also is clear that there exist many English words which are available to the defendants to describe the type of cold metal repair services which they offer.

### "ABANDONMENT"

The Lanham Act provides that a mark is deemed abandoned when its use has been discontinued with intent not to resume use or, "when any course of conduct of the registrant, including acts of omission as well as commission, causes the mark to lose its significance as an indication of origin." 15 U.S.C. § 1127(b). There is no evidence in this case that the owners of the mark METALOCK have discontinued its use or have any intent to abandon its use. Cf. *Exxon Corp. v. Humble Exploration Co., Inc.*, 695 F.2d 96 (5th Cir.1983) (where Exxon came dangerously close to losing its former mark "Humble" by non-use). Consequently, the defendants argue that the evidence shows that the owners have allowed uncontrolled licensing and use of the mark to such an extent that it has lost its significance or distinctiveness as a symbol of quality.

■ Abandonment is an affirmative defense and because it is in the nature of a forfeiture, defendants bear a burden of strict proof. *American Foods, Inc. v. Golden Flake, Inc.*, 312 F.2d 619, 624 (5th Cir.1963).

■ Although actual abandonment of a mark equates to intention to abandon, that term covers a variety of activities by the owner which can result in the mark losing its function as a symbol of origin and quality. 1 J. McCarthy, *Trademarks and Unfair Competition* § 17.2 (1973); 3 R. Callmann, *The Law of Unfair Competition, Trademarks and Monopolies* § 19.64 (4th ed. 1983).

The only license cited by the defendants is the 1980 license executed between plaintiff, Metalock Corporation, and plaintiff, EMS. EMS filed an opposition to Metalock Corporation's application for a service mark but subsequently withdrew it. The licensing agreement was apparently entered as a result of negotiations between the parties arising out of the application

for and opposition to the service mark ME-TALOCK. Despite the insinuations in the brief filed on behalf of defendants, this court finds nothing sinister in reasonable business men sitting down and resolving their differences without litigation (would that it had been done here).

The main thrust of the defendants on this argument is that the EMS license contains less stringent quality control provisions than a 1979 license granted by Metalock Corp. to a California concern. This court is aware of no law and defendants have cited none, requiring that all licenses granted by the owner of a registered trademark be identical. The EMS license does contain quality control provisions. All work performed "shall be of reasonable quality and shall be performed by experienced personnel," materials shall be "particularly selected for the particular job" and shall be of reasonable quality, all complaints regarding repairs performed shall be investigated and "shall be remedied to the satisfaction of the customer, unless the demands are unreasonable." The EMS license limits EMS to a defined territory, restricts the granting of sub-licenses and requires that sub-licensees abide by the quality control provisions of the EMS agreement.

■ Defendants have offered no evidence that complaints have been made about the quality of the work performed by EMS, either to EMS or to Metalock Corp. and the agreement grants Metalock Corp. the right to terminate the license for "failure to maintain proper quality control." Courts do not and ought not to supervise the terms and provisions of every licensing agreement as to quality control. "Retention of a trademark requires only minimal quality control, for in this context we do not sit to assess the quality of products sold on the open market." *Kentucky Fried Chicken, Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 387 (5th Cir. 1977).

■ The EMS license is clearly not "naked"; it is fully clothed with adequate quality controls and the ultimate authority to terminate if quality is not adequate. Accordingly, it certainly maintains the effectiveness of the trademark. *Sheila's Shine Products, Inc. v. Sheila Shine, Inc.*, 486 F.2d 114 (5th Cir.1973); *American Foods Inc. v. Golden Flake, Inc.*, 312 F.2d 619 (5th Cir.1963).

■ Defendants also claim that Metalock Corp.'s inaction in prosecuting infringers has resulted in such a loss of distinctiveness of the mark as to constitute an "abandonment." While this is not technically an abandonment, if such a situation were allowed to develop, it could certainly cause problems for the owner of the mark. As Mr. McCarthy puts it:

A trademark owner's failure to enforce his rights against infringers may amount to abandonment, since when many make use of a similar mark, its function as a symbol of origin in one person is lost. Failure to take reasonable steps to prevent use of the mark by others will gradually dilute the distinctiveness of the mark such that it no longer signifies only one source or one level of quality. Failure to prosecute many infringers may at least result in the mark becoming "weak" and entitled to only a narrow scope of protection. Where infringements exist, and the mark owner has been reasonably diligent in preserving his rights, no intent to abandon will be inferred.

A long delay in instituting suit against a defendant, which causes prejudice, may constitute a defense of laches or acquiescence. However, laches is not the same as abandonment. Laches or acquiescence is a defense of one person, while abandonment is a loss of rights as against the whole world.

1 J. McCarthy, *Trademarks and Unfair Competition*, § 17:5, at 596–97 (1973) (footnotes omitted).

There is some question as to whether a failure to prosecute other infringers constitutes a defense at all; the existence of other infringers seems irrelevant as to the defendants' wrong-doing. *See United*

*States Jaycees v. San Francisco Junior Chamber of Commerce*, 354 F.Supp. 61 (N.D.Calf.1972), *aff'd*, 513 F.2d 1226 (9th Cir.1975). "The owner of a mark is not required to police every conceivably related use," in order to maintain the effectiveness of the mark. *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.*, 486 F.Supp. 414, 422–23 (S.D.N.Y.1980).

The evidence before this court shows that Metalock Corp. *has* prosecuted infringers. Suit was instituted against In-Place Machinery Company in the United States District Court for the Eastern District of Wisconsin and a judgment dated October 21, 1977 was obtained. Metalock Corp. made demand upon the Westinghouse Corp. which was using the mark METAL-OCK in the Pittsburg area and secured cessation of that use. Metalock Corp. has investigated the use of the mark by others, a fence company in New York that went out of business, a small bicycle welding shop in Florida which ceased using the mark, "Metalock International" of London, which used the mark "Unilock" not METALOCK in the United States, a Mr. Morehouse, former Scott agent in Alabama, who died in the late 1970's ending that business. Metalock Corp. filed suit in Georgia against a Mr. Finch, another former Scott agent, and secured an agreement to cease using the mark, although at this trial the defendants have produced evidence that Mr. Finch may have breached that agreement and resumed the use of the mark.

Most of the defendants' fire is directed at Mr. Borey of Metal-Locking of Louisiana and Mr. Jackman of Metalock Service, Incorporated in Buffalo, New York, both businesses founded by former employees of Scott. Mr. Jackman testified by deposition that his father founded the Buffalo business under license from Scott but that they stopped paying royalties to Scott after they learned that Scott had lost the patent litigation with Harmon, that they continued to use the mark and the process and that neither Scott nor anyone else has ever called upon them to stop that use. Borey testified that, although Scott knew of his business and made no objection to it, he never had any license agreement with Scott. Borey also admitted that he is not the owner of the mark METALOCK.

The evidence indicates that the Buffalo business and the New Orleans business are not in significant direct competition with either plaintiff Metalock Corp. or plaintiff EMS. It might be that through long inaction, Metalock Corp. would be held to have acquiesced in the operations of Metal-Locking of Louisiana and of the Jackman business in Buffalo as to their respective territories, *Sheila's Shine Products, Inc. v. Sheila Shine, Inc.*, 486 F.2d 114 (5th Cir.1973). Whatever might be the outcome of that litigation, should it occur, it will not excuse infringement by these defendants. The evidence in this case shows that Metalock Corp. has and is continuing to take reasonable steps to maintain its rights in the mark, to use that mark, to license its use, to advertise it and to prosecute infringers. The owner of a mark is not required to constantly monitor every nook and cranny of the entire nation and to fire both barrels of his shotgun instantly upon spotting a possible infringer. Lawyers and lawsuits come high and a financial decision must be made in every case as to whether the gain of prosecution is worth the candle. These defendants have not proved that because of the lack of efforts by plaintiffs in "policing" use of the mark, that METALOCK has become so diluted by widespread use by others that it has lost its distinctiveness.

## CONCLUSION

Although the defendants have raised other issues, such as the argument that because Mr. Scott's patents have expired, the trademark as well as the invention have become a part of the public domain, they are so weak that they are simply unworthy of comment. Accordingly, this court concludes that plaintiffs are the owner and licensee respectively of the registered mark METALOCK, that the mark has become incontestable, that the defendants are using the mark in such a fashion that there is

a likelihood of confusion and that the defendants have failed to prove any defense. Accordingly, plaintiffs are entitled to injunctive relief prohibiting continued use by the defendants of the mark or any facsimile thereof which is likely to confuse. Plaintiffs have prayed for an accounting; although the evidence indicates that such an accounting would probably require more effort than warranted, plaintiffs may move for such an accounting, if they so desire.