United States Court of Appeals,

Fifth Circuit.

Nos. 96-20398, 96-20520.

EXXON CORPORATION, Plaintiff-Appellee,

v.

OXXFORD CLOTHES, INC. and Oxxford Clothes XX, Inc., Defendants-Appellants.

April 10, 1997.

Appeals from the United States District Court for the Southern District of Texas.

Before KING, GARWOOD and PARKER, Circuit Judges.

GARWOOD, Circuit Judge:

Defendants-appellants Oxxford Clothes, Inc., and Oxxford Clothes XX, Inc. (Oxxford), appeal the district court's judgment dismissing Oxxford's affirmative defense of naked licensing and Oxxford's state law dilution counterclaim in this trademark dispute with plaintiff-appellee Exxon Corporation (Exxon). We affirm.

**Facts and Proceedings Below**

Both the "Exxon" mark and the complementary stylized interlocking "XX" symbol have been used by Exxon since the early 1970's, both marks receiving federal registration in 1972. In 1949, Oxxford federally registered as a trademark the name "Oxxford," written in the romanized alphabet but not including any stylized or interlocking "XX" design.

For more than two decades Exxon has aggressively protected its mark from infringement and/or dilution by seeking out and negotiating with other companies using marks similar to its own. In lieu of conclusive litigation, many of these companies opted to enter "phase out" agreements with Exxon in which the other company agreed that after existing stores of stationary, advertising materials, and products bearing the offending mark were exhausted, use of that mark would be discontinued. These phase out periods afforded the potentially infringing or diluting companies time to develop and implement a new mark. The phase out agreements did not contain any quality control mechanisms ensuring the quality of goods or services offered under the offending mark during the

phase out period.[1]

In 1993, Oxxford began using a trademark featuring an interlocking "XX" design virtually identical to that long previously registered by Exxon. Exxon filed suit against Oxxford[2] in October of 1994, complaining that Oxxford's use of the interlocking "XX" design infringed its federally-registered trademark, diluted Exxon's mark, and otherwise constituted an unfair business practice. Exxon amended its complaint twice, ultimately dropping all but its Texas law dilution claim.[3]

In response to Exxon's second amendment of its complaint, Oxxford filed an amended answer raising a bevy of affirmative defenses, prime among these being an assertion that Exxon's phase out agreements with other allegedly infringing and diluting companies constituted "naked licenses." The gist of Oxxford's argument was that these agreements, insofar as they authorized third parties to continue to use infringing or diluting marks with Exxon's knowledge and approval, were "licenses"; and, because these "licenses" contained no quality control provision, they were "naked licenses" which, under prevailing law, could lead to forfeiture of Exxon's rights in its licensed marks.

On May 31, 1995, Oxxford filed a counterclaim alleging that, under Texas law, Exxon's use of its trade name, "Exxon" (without regard to the interlocking "XX" design), had diluted or tarnished its name and registered mark, "Oxxford." The basis of Oxxford's claim was a purported ease of association between "Exxon" and "Oxxford" which might lead aspects of Exxon's alleged corporate

---

[1]Phase out agreements orchestrated by Exxon during the 1970s did give Exxon quality control rights over the alleged infringer or diluter's products. Later phase out agreements, however, did not give Exxon such rights. It is these later agreements on which Oxxford's naked licensing defense is based. There are some fourteen of these later agreements. One of these has a three-year phase out period. All the rest are shorter, the next longest period being one year, which is provided for in four of these agreements; one has a ten-month period; two have six months; the remainder are three months or less. Five of these agreements settle litigation then actually pending.

[2]Exxon initially filed suit against Oxxford Clothes, Inc. In December of 1994, two months after this suit was filed, the assets of Oxxford Clothes, Inc., were purchased through a foreclosure sale by another corporation, John F. McDonough, Inc., a wholly-owned subsidiary of Tom James Company. John F. McDonough, Inc., subsequently changed its name to Oxxford Clothes XX, Inc. Oxxford Clothes XX, Inc., was added to this lawsuit in its capacity as successor-in-interest to Oxxford Clothes, Inc., pursuant to Fed. R. Civ. Pro. 25(c).

[3]Jurisdiction over Exxon's final complaint was founded on diversity.

reputation for general greed and environmental destructiveness to be negatively attributed to Oxxford. The requested relief was that Exxon be enjoined from using its registered marks.

Both parties filed a plethora of motions, the pertinent ones for purposes of this appeal being cross-motions for summary judgment on Oxxford's affirmative defenses, motions by Exxon to dismiss Oxxford's dilution counterclaim and to strike portions of that counterclaim, and a motion for partial summary judgment by Oxxford challenging Exxon's laches defense to its counterclaim.

On March 18, 1996, the district court entered a memorandum opinion and order in which, *inter alia,* it granted Exxon summary judgment on Oxxford's affirmative defense of naked licensing. The district court concluded that Exxon's phase out agreements were not licenses because, contrary to Oxxford's assertion that the agreements permitted third parties to continue misleading uses of Exxon's mark, the phase out agreements were in fact an appropriate mechanism for halting such activities, *i.e.*, legal settlements which ultimately secured Exxon's rights in its marks while avoiding the time and expense associated with trademark litigation. The district court also opined that the allegedly infringing and/or diluting companies which were party to these phase out agreements would have had no interest in being associated with Exxon and thus no reason to consent to the quality control provisions; therefore, imposing such a condition would have led these third parties to balk at entering the phase out agreements, limiting the utility of these devices in the resolution of trademark disputes. Finally, noting that the failure to prosecute or pursue infringers or diluters does not necessarily result in forfeiture of the trademark holder's exclusive rights in the mark, the district court posited that "[i]t would be anomalous for the Court to find facts supporting abandonment because Exxon has a strong enforcement program."

The district court also rendered summary judgment in Exxon's favor on Oxxford's tarnishment-dilution counterclaim. The district court rested its ruling on three separate determinations: 1) "Oxxford" is not a distinctive mark; 2) Oxxford failed to show that its mark had been used in an "unwholesome context" by Exxon; and 3) because Oxxford knew of the similarity between the marks for over twenty years and failed to act, the counterclaim is barred by laches. Based on the dismissal of Oxxford's counterclaim, the district court also granted Exxon's motion to

strike those allegations in Oxxford's counterclaim impugning Exxon's reputation.

The district court entered an order certifying the dismissal of Oxxford's counterclaim as a partial final judgment under Federal Rule of Civil Procedure 54(b). The district court also certified the order dismissing Oxxford's affirmative defenses for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).[4] Oxxford timely noticed an appeal from the Rule 54(b) judgment, and also petitioned this Court for interlocutory appeal under section 1292(b). Permission to pursue an interlocutory appeal was granted, and both appeals were docketed and later consolidated for purposes of oral argument and final disposition.

## Discussion

Oxxford appeals the district court's grant of summary judgment rejecting its affirmative defense of naked licensing and its tarnishment-dilution counterclaim.[5] Accordingly, the admissible evidence proffered by Exxon "must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of [Oxxford's claim and defense]." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (en banc) (citations omitted) (internal quotation marks omitted). If Exxon meets this burden, then Oxxford is compelled to go beyond its pleadings and designate, by competent summary judgment evidence, specific facts which demonstrate genuine triable issues. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324-325, 106 S.Ct. 2548, 2553-2554, 91 L.Ed.2d 265 (1986). This formula does not vary where Exxon is the plaintiff challenging Oxxford's affirmative defense; because Oxxford bears the ultimate burden of persuasion at trial on its naked licensing defense, it must (provided Exxon has met its summary judgment burden) present admissible evidence legally sufficient to sustain a finding favorable to Oxxford on each element of that defense. *Crescent Towing &*

---

[4]The district court initially certified the order dismissing Oxxford's affirmative defenses as a partial final judgment under Rule 54(b). Oxxford noticed an appeal from that judgment, which was docketed in this Court under No. 96-20397 and has been dismissed for lack of appellate jurisdiction in a separate opinion issued this date. Nonetheless, we consider here all issues fairly presented by the district court's order of dismissal pursuant to section 1292(b). *Yamaha Motor Corp. v. Calhoun,* --- U.S. ----, 116 S.Ct. 619, 133 L.Ed.2d 578 (1996).

[5]The district court's memorandum opinion and order embrace a large number of issues; Oxxford has chosen to brief only two, the dismissal of its affirmative defense of naked licensing and its dilution counterclaim. All other issues, not raised or briefed on appeal, are waived. *Cavallini v. State Farm Mut. Auto Ins. Co.,* 44 F.3d 256, 260 n. 9 (5th Cir.1995).

*Salvage Co. v. M/V Anax,* 40 F.3d 741, 744 (5th Cir.1994). In reviewing the district court's judgment, we consider the record *de novo. Wittorf v. Shell Oil Co.,* 37 F.3d 1151, 1154 (5th Cir.1994).

I. Naked Licensing Defense

We consider first Oxxford's claim that the district court erred in granting Exxon summary judgment on Oxxford's affirmative defense of naked licensing.[6] A naked license is a trademark

---

[6]Both parties in briefing this issue have relied exclusively upon jurisprudence articulating the parameters of the naked licensing defense in the context of a federal trademark infringement claim, forgetting, apparently, that the only claim alleged by Exxon which remains extant is its state law dilution claim. No court construing Texas law has ever discussed, much less applied, the naked licensing defense in a trademark dispute. Furthermore, we have been unable to locate any cases construing federal trademark law which recognize naked licensing as a defense against a *dilution* (as opposed to an infringement) claim, perhaps because a federal cause of action for trademark dilution was apparently not available until the Lanham Act was amended to include one in 1996. *See* 15 U.S.C. § 1125(c), *added by* Pub.L. 104-98, § 3(a) (1996); *Community Federal Savings & Loan Assoc. v. Orondorff,* 678 F.2d 1034, 1036 n. 7 (11th Cir.1982) (no independent cause of action for dilution under federal trademark law); *R.G. Barry Corp. v. Mushroom Makers, Inc.,* 612 F.2d 651, 658 (2d Cir.1979) (same). This situation is complicated further by the fact that Texas common law does not recognize a cause of action for dilution and the statutory cause of action, upon which both parties rely, has not been decisively interpreted by any Texas court. Tex. Com. & Bus.Code § 16.29, *added by* Acts 1989, 71st Leg., ch. 932, § 1; *Suniland Furniture Co. v. Sunnyland Wholesale Furniture Co.,* 235 S.W.2d 674, 676-677 (Tex.Civ.App.—Dallas 1950, error refused) (Texas common law does not recognize cause of action for trademark dilution). We also observe that there exists some incongruity between the naked licensing defense, which like much of federal trademark law is intended to protect the consumer from confusion by ensuring the licensed mark's continuing role as an indicator of origin, and dilution, which is concerned with preserving the integrity and vitality of the mark irrespective of consumer confusion.

Despite these difficulties, our review of the record and briefs convinces us that by addressing the issue as framed by the parties we may fairly adjudicate this case. Furthermore, we have previously found that, in considering a *res nova* issue under Texas trademark law, *Erie* requires this Court to decide the issue as a Texas court would, namely by adhering "to the general common law principles that other courts have uniformly applied." *Association of Co-Operative Members, Inc. v. Farmland Industries, Inc.,* 684 F.2d 1134, 1140 (5th Cir.1982), *cert. denied,* 460 U.S. 1038, 103 S.Ct. 1428, 75 L.Ed.2d 788 (1983), *citing Blue Bell, Inc. v. Farah Manufacturing Co.,* 508 F.2d 1260, 1264 (5th Cir.1975). In thus construing Texas trademark law, both this Court and Texas courts have relied upon relevant jurisprudence from other, primarily federal, jurisdictions and relevant treatises. *See, e.g., Blue Bell,* 508 F.2d at 1264-1267; *Texas A & M University System v. University Book Store, Inc.,* 683 S.W.2d 140, 144 (Tex.App.—Waco 1984). Thus, given the lacunae in Texas trademark law regarding the points raised in this appeal, we consider the question presented in light of general *federal* trademark law, with recourse to the abundant federal jurisprudence and treatise materials available on the issue. In doing so, we assume *arguendo,* for purposes of this appeal only, the debatable proposition that the naked licensing defense may be raised against a dilution claim brought under the Texas statute.

licensor's grant of permission to use its mark without attendant provisions to protect the quality of the goods or services provided under the licensed mark. *Moore Business Forms, Inc. v. Ryu,* 960 F.2d 486, 489 (5th Cir.1992); *Taco Cabana Intern., Inc. v. Two Pesos, Inc.,* 932 F.2d 1113, 1121 (5th Cir.1991), *aff'd,* 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). A trademark owner's failure to exercise appropriate control and supervision over its licensees *may* result in an abandonment of trademark protection for the licensed mark. *Id. See Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena,* 293 F.Supp. 892, 918 (S.D.N.Y.1968) ("a "naked' license *may* be the basis for an *inference* of abandonment where the licensor maintains no control over the quality of goods made by the licensee") (emphasis added; citation omitted), *aff'd as modified,* 433 F.2d 686 (2nd Cir.1970), *cert. denied,* 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971). Because naked licensing is generally ultimately relevant only to establish an unintentional trademark abandonment which results in a loss of trademark rights against the world,[7] the burden of proof faced by third parties attempting to show abandonment through naked licensing is stringent. *Moore Business Forms,* 960 F.2d at 489; *Taco Cabana Intern., Inc.,* 932 F.2d at 1113, 1121; *American Foods, Inc. v. Golden Flake, Inc.,* 312 F.2d 619 (5th Cir.1963).

Oxxford's appeal raises two central questions in relation to its naked licensing defense: 1)

---

[7]There is an exception to this proposition. The licensee in a purported naked license may also invoke the naked licensing defense as a form of estoppel. *See, e.g., Sheila's Shine Products, Inc. v. Sheila Shine, Inc.,* 486 F.2d 114, 123-124 (5th Cir.1973) ("[f]ailure to exercise such control and supervision for a significant period of time may estop the trademark owner from challenging the use of the mark and business which the licensee has developed during the period of such unsupervised use") (citations omitted); *Health Industries v. European Health Spas,* 489 F.Supp. 860, 868 (D.S.D.1980) (discussing claim that reciprocity agreement with trademark owner's employee is sufficient to estop trademark owner from contesting defendant's use of that mark). Oxxford, however, was not a party to (and does not hold under any party to) the phase out agreements at issue in this case; thus, its defense is not a personal defense of acquiescence or estoppel, but is rather a claim that Exxon has abandoned its mark and thereby forfeited all its rights in that mark. 4 Thomas J. McCarthy, Trademarks and Unfair Competition, § 31:41-46 (4th ed.1996); *Sweetheart Plastics, Inc. v. Detroit Forming, Inc.,* 743 F.2d 1039, 1046 (4th Cir.1984) ("[w]hile abandonment results in a loss of rights as against the whole world, ... acquiescence is a personal defense which merely results in a loss of rights as against one defendant") (citation omitted).

We reject Oxxford's argument that, this single, here-inapplicable exception aside, naked licensing has any presently relevant ultimate significance apart from its relevance in showing unintentional abandonment.

were the phase out agreements between Exxon and the third parties "licenses," and 2) did these agreements result in an abandonment of Exxon's mark?  We address these questions in turn.

"[A] license to use a mark ... is a transfer of limited rights, less than the whole interest which might have been transferred." *Acme Valve & Fittings Co. v. Wayne,* 386 F.Supp. 1162, 1165 (S.D.Tex., Houston Div., 1974) (citations omitted).  Even if the parties intend no formal licensing agreement, "[i]n some circumstances ... the entire course of conduct between a ... trademark owner and an accused infringer may create an implied license." *McCoy v. Mitsuboshi Cutlery, Inc.,* 67 F.3d 917, 920 (Fed.Cir.1995), *cert. denied,* --- U.S. ----, 116 S.Ct. 1268, 134 L.Ed.2d 215 (1996).  *See also Colt Industries, Inc. v. Fidelco Pump & Compressor Corp.,* 844 F.2d 117, 119-120 (3rd Cir.1988).  The essential inquiry is whether, under cover of the agreement claimed to be a license, "the licensee is engaging in acts which would infringe the licensor's mark but for the permission granted in the license."  2 McCarthy, § 18:79, P. 18-128.

However, not all agreements authorizing use of a protected mark may be categorized as "licenses."  As noted above, the essential inquiry is whether the right granted by the subject agreement permits an *infringing* use of the license.  For example, some agreements which allow another party use of the subject mark constitute "consent-to-use" agreements and not licenses.  *See, e.g., Moore,* 960 F.2d at 489; *American Foods, Inc. v. Golden Flake, Inc.,* 312 F.2d 619, 623-624 (5th Cir.1963).  Such a consensual agreement "[i]s not an attempt to transfer or license the use of a trademark ... but fixes and defines the existing trademark of each ... [so] that confusion and infringement may be prevented." *Waukesha Hygeia Mineral Springs Co. v. Hygeia Sparkling Distilled Water Co.,* 63 F. 438, 441 (7th Cir.1894).  Thus, we will not find the existence of a trademark license when an authorization of trademark use is structured in such a way as to avoid misleading or confusing consumers as to the origin and/or nature of the respective parties' goods.  2 McCarthy, § 18:79-81 (4th ed.1996); *In re Mastic Inc.,* 829 F.2d 1114, 1116-1118 (Fed.Cir.1987); *A.T. Cross Co. v. Jonathan Bradley Pens, Inc.,* 470 F.2d 689, 692-693 (2d Cir.1972); *Croton Watch Co. v. Laughlin,* 208 F.2d 93, 96-97 (2d Cir.1953); *Oreck Corp. v. Thomson Consumer Electronics, Inc.,* 796 F.Supp. 1152, 1157 n. 8 (S.D.Ind.1992).

Determining whether or not a particular agreement risks the possibility of allowing an infringing use of the mark, *i.e.,* a use that creates a likelihood of consumer confusion, is, like the entirety of Oxxford's abandonment claim, ordinarily a factual inquiry. *Moore Business Forms,* 960 F.2d at 489; *Artcraft Novelties Corp. v. Baxter Lane Co. of Amarillo,* 685 F.2d 988, 992 (5th Cir.1982). As the Federal Circuit has put it,

> "One must look at all of the surrounding circumstances ... to determine if the consent reflects the reality of no likelihood of confusion in the marketplace.... For example, the parties may prefer the simplicity of a consent to the encumbrances of a valid trademark license. However, if the goods of the parties are likely to be attributed to the same source because of the use of the same or a similar mark, a license (not merely a consent) is necessary to cure the conflict. *See* 1 J. McCarthy, *Trademarks and Unfair Competition* § 18:25, at 866 (2d ed.1984)." *In re Mastic,* 829 F.2d at 1116-1117.

Accordingly, if the goods or services of the concerned third parties were not ones which it is likely the public would confuse with those offered by Exxon, the phase out agreements are not licenses but rather some other, perhaps innominate, genre of trademark agreement.[8]

The district court did not make any determination regarding the likelihood of consumer confusion presented by Exxon's phase out agreements. Accordingly, we elect to assume, *arguendo only,* that these agreements constituted "licenses" in a technical sense.[9] This does not give us pause,

---

[8]This emphasis on the likelihood of consumer confusion dovetails with the policy considerations giving rise to the naked licensing defense. *See Taco Cabana,* 932 F.2d at 1121 ("[t]he purpose of the quality-control requirement is to prevent the public deception that would ensue from variant quality standards under the same mark or dress") (citation omitted); *United States Jaycees v. Philadelphia Jaycees,* 639 F.2d 134, 140 (3d Cir.1981) (finding fact that licensees did not offer "a lower quality of service" dispositive of naked licensing claim); *Schieffelin & Co. v. Jack Co. of Boca, Inc.,* 1992 WL 156560, *6 (S.D.N.Y.1992) ("[i]n the context of uncontrolled licensing, the concern is not with the quality of the goods in the abstract; rather, the concern is that when one or more licensees produce and distribute goods under the licensor's trademark ... they may produce and distribute goods of differing qualities, thereby confusing or deceiving consumers"); *Engineered Mechanical Services, Inc. v. Applied Mechanical Technology, Inc.,* 584 F.Supp. 1149, 1159 (M.D.La.1984) (naked licensing claim cannot stand when "[d]efendants have offered no evidence that complaints have been made about the quality of the work performed" by the licensee).

[9]Courts have construed a variety of agreements and relationships entered into for a range of reasons, including the cessation or forbearance of litigation, to be trademark licenses subject to the naked licensing defense. *E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1289-1290 (9th Cir.1992) (settlement agreement); *Stock Pot Restaurant, Inc. v. Stockpot, Inc.,* 737 F.2d 1576, 1579-1580 (Fed.Cir.1984) (lease); *United States Jaycees,* 639 F.2d at 139 n. 7 (affiliated organizations); *Professional Golfers Ass'n v. Bankers L. & C. Co.,* 514 F.2d 665, 668-669 (5th Cir.1975) (settlement and lease); *Sheila's Shine Products, Inc. v. Sheila Shine, Inc.,* 486 F.2d 114, 123 (5th Cir.1973) (purchase agreement); *Express, Inc. v. Sears, Roebuck & Co.,* 840

however, since the question whether the third-party phase out agreements are "licenses" is merely, given the current posture of this case, a prelude to the ultimate question presented by Oxxford's appeal, *i.e.,* whether the summary judgment evidence adduced would be adequate to support a finding that Exxon's course of action resulted in abandonment of its trademarks.

The naked licensing defense has traditionally been used in the context of infringement claims brought by the trademark owner; and, this case began in such a mode. *See, however,* note 6, *supra.* Federal law statutorily limits the defenses which may be invoked against a claim brought under the Lanham Act by the owner of an incontestable mark, as Exxon is, to the eight categories of affirmative defenses set out in subsections (1)-(8) of 15 U.S.C. § 1115(b). *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 195-196, 105 S.Ct. 658, 662, 83 L.Ed.2d 582; *Soweco, Inc. v. Shell Oil Co.,* 617 F.2d 1178, 1184 (5th Cir.1980), *cert. denied,* 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981). Accordingly, we turn our attention to the Lanham Act, the font of federal trademark law,

---

F.Supp. 502, 509-510 (S.D.Ohio 1993) (settlement agreements); *Engineered Mechanical Services, Inc.,* 584 F.Supp. at 1158-1159; *Universal City Studios, Inc. v. Nintendo Co.,* 578 F.Supp. 911, 929 (S.D.N.Y.1983) (covenant not to sue), *aff'd,* 746 F.2d 112 (2d Cir.1984); *Hodge Chile Co. v. KNA Food Distributors, Inc.,* 575 F.Supp. 210, 213 (E.D.Mo.1983) (settlement agreement), *aff'd,* 741 F.2d 1086 (8th Cir.1984); *Acme Valve & Fittings,* 386 F.Supp. at 1165-1166 (purchase order form); *Naclox, Inc. v. Lee,* 231 U.S.P.Q. 395, 399 (T.T.A.B.1986) (release on promissory note). We find these cases distinguishable from that now before us on two grounds. First, the agreements in these cases expressly granted use of the protected mark, while Exxon's phase out agreements concern marks that are merely (allegedly) similar to its registered marks and do not involve an attempt by Exxon to exploit its mark for purposes of pecuniary gain. Second, none of these cases discuss agreements entered into for the purpose of permanently terminating the putative licensee's offending use of the subject mark, and coordinately none of the agreements discussed in these cases fix a termination date for the licensee's use of the mark. This first point of distinguishment addresses the existence *vel non* of a license, while the second point is perhaps more appropriately considered in resolving the ultimate question of whether Exxon's actions, however denominated, led to an abandonment of its rights in its mark(s).

Oxxford also suggests that Exxon, by virtue of allegations made in the course of the abortive litigation which preceded a number of the phase out agreements, is judicially estopped from denying that the parties to those phase out agreements were engaged in an "infringing use" of Exxon's mark. Assuming, *arguendo only,* the potential viability of such a contention in an appropriate case, the record here does not reveal that any of these allegations were accepted as true by the respective courts; accordingly, the doctrine of judicial estoppel is inapplicable. *U.S. for Use of American Bank v. CIT Constr., Inc. of Texas,* 944 F.2d 253, 259 (5th Cir.1991).

to ascertain the scope and limits of Oxxford's naked licensing defense.[10]

Oxxford's naked licensing defense, which as we have noted has ultimate relevance only to "abandonment," is authorized by 15 U.S.C. § 1115(b)(2).[11]  *See Stanfield v. Osborne Indus., Inc.,* 52 F.3d 867, 871 (10th Cir.), *cert. denied,* --- U.S. ----, 116 S.Ct. 314, 133 L.Ed.2d 217 (1995); *Ditri v. Coldwell Banker,* 954 F.2d 869, 873 (3d Cir.1992);  *General Motors Corp.,* 786 F.2d at 110; *Oberlin v. Marlin American Corp.,* 596 F.2d 1322, 1327 (7th Cir.1979);  *Haymaker Sports, Inc. v. Turian,* 581 F.2d 257, 261 (C.C.P.A.1978);  *Dawn Donut,* 267 F.2d at 366-367;  *Schieffelin & Co.,* 1992 WL 156560, *5;  *E.I. DuPont De Nemours,* 167 F.2d at 489-490;  *Bonda's Veevoederfabriek, Provimi, B.V. v. Provimi, Inc.,* 425 F.Supp. 1034, 1037-1038 (E.D.Wis.1977).  15 U.S.C. § 1127, the definitional section of the Lanham Act, defines "abandonment" as follows:

A mark shall be deemed to be "abandoned" if either of the following occurs:

---

[10]Unlike patents and copyrights, there is no specific constitutional provision making the regulation of trademarks a federal concern, and the first constitutional federal trademark act, passed pursuant to the Commerce Clause, was not enacted until 1905.  1 McCarthy, § 5.3. *See also Trade-Mark Cases,* 100 U.S. 82, 25 L.Ed. 550 (1879).  The doctrine of "naked licensing" predated the passage of the Lanham Act, which took effect in 1947, and evolved in the pre-*Erie* world where federal common law provided the rule of decision in diversity cases. *See E.I. DuPont De Nemours & Co. v. Celanese Corp.,* 35 C.C.P.A. 1061, 167 F.2d 484, 489 (1948) (listing cases).  *See also Dawn Donut v. Hart's Food Stores,* 267 F.2d 358, 366-367 (2d Cir.1959) (discussing divergent strains of naked licensing jurisprudence antedating passage of Lanham Act).  Be that as it may, we are concerned with the applicability of the naked licensing defense as it is defined under current federal law.  Given the absence of a specific federal constitutional concern with the law of trademarks, that law is indisputably statutory. *See generally O'Melveny & Myers v. FDIC,* 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994). Accordingly, it is the language of the Lanham Act which under the circumstances of this appeal (see note 6, *supra* ) decides the questions presented.

[11]Both Oxxford and Exxon point to subsection 1115(b)(3) as the or a basis for Oxxford's naked licensing defense.  This subsection provides a defense to an infringement claim if "the registered mark is being used ... so as to misrepresent the source of the goods or services on or in connection with which the mark is used."  A review of the jurisprudence construing this defense reveals that it is a defense of "unclean hands," only applicable when the origin or source of goods distributed under the subject mark is misrepresented. *See General Motors Corp. v. Gibson Chemical & Oil,* 786 F.2d 105, 110 (2d Cir.1986);  *Induct-O-Matic Corp. v. Inductotherm Corp.,* 747 F.2d 358, 366 (6th Cir.1984);  *Adjusters International, Inc. v. Public Adjusters Intern., Inc.,* 1996 WL 492905, *14 (N.D.N.Y.1996);  *Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.,* 841 F.Supp. 1339, 1355 (E.D.N.Y.1994).  Further, acquiescence, estoppel, and the other equitable defenses listed in subsection (b)(8) are personal defenses, based upon the trademark owner's conduct *vis-a-vis* the defendant, and thus also do not speak to the wholesale loss of rights in the mark remarked upon by naked licensing jurisprudence. *See* note 7, *supra.*  Oxxford has not made any showing which would sustain a subsection 1115(b)(3) defense to Exxon's action against it.

(1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in the mark.

(2) When any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark. Purchaser motivation shall not be a test for determining abandonment under this paragraph.

The definition of "abandonment" set forth in subpart (2) (formerly subpart (b)) is the specific statutory explication of unintentional abandonment, including abandonment due to naked licensing.[12]

*Sweetheart Plastics,* 743 F.2d at 1047-48; *United States Jaycees,* 639 F.2d at 139; *A.T. Cross Co.,*

---

[12]A number of courts have also cited to section 1055, often in tandem with section 1127, as statutory authority for the naked licensing defense. *Visa, U.S.A., Inc. v. Birmingham Trust Nat. Bank,* 696 F.2d 1371, 1377 n. 4 (Fed.Cir.1982), *cert. denied,* 464 U.S. 826, 104 S.Ct. 98, 78 L.Ed.2d 104 (1983); *Oberlin v. Marlin American Corp.,* 596 F.2d at 1327 n. 4; *Sterling Drug, Inc. v. Lincoln Laboratories, Inc.,* 322 F.2d 968, 972 (7th Cir.1963); *Dawn Donut,* 267 F.2d at 366-367; *Georgia Carpet Sales, Inc. v. SLS Corp.,* 789 F.Supp. 244, 246 (N.D.Ill.1992); *Ungar v. Dunkin' Donuts of America, Inc.,* 68 F.R.D. 65, 116 (E.D.Pa.1975), *rev'd on other grounds,* 531 F.2d 1211 (3rd Cir.), *cert. denied,* 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976). This provision reads in pertinent part as follows:

### § 1055. Use by related companies affecting validity and registration

Where a registered mark ... is or may be used legitimately by related companies, such use shall inure to the benefit of the registrant ... and such use shall not affect the validity of such mark or of its registration, *provided such mark is not used to deceive the public.* (Emphasis added).

The term "related companies" is defined in section 1127 as follows:

The term "related company" means any person whose use of a mark is controlled by the owner of the mark with respect to the nature and quality of the goods or services on or in connection with which the mark is used.

*See also Health Industries,* 489 F.Supp. at 868 (equating quality control and mandate that public not be deceived). Section 1055 authorizes a trademark owner to license its mark "but only where the licensees of the service mark are related companies, i.e. where the owner of the service mark controls the licensees as to the nature and quality of the goods or services in connection with which the mark is used." *Reddy Communications v. Environmental Action,* 477 F.Supp. 936, 944 (D.D.C.1979) (citations omitted) (internal quotation marks omitted).

Section 1055 does not of itself establish a naked licensing defense. So far as here relevant, its effect is merely to reflect conditions under which certain conduct is not *per se* precluded from consideration, as supportive, to the extent that it may logically do so in a given setting, of a determination that there has been abandonment as defined in section 1127(2).

470 F.2d at 693; *Heaton Distributing Co. v. Union Tank Car Co.,* 387 F.2d 477, 484 (8th Cir.1967); *Schieffelin & Co.,* 1992 WL 156560, *5; *Engineered Mechanical Services,* 584 F.Supp. at 1158.

The language of subsection 1127(2) reflects that to prove "abandonment" the alleged infringer must show that, due to acts or omissions of the trademark owner, the incontestable mark has lost "its significance as a mark." *See Defiance Button Mach. Co. v. C & C Metal Products,* 759 F.2d 1053, 1061-1062 (2d Cir.) (concluding that section 1127(2) was intended to apply only when the subject mark ceased to be an indicator of origin), *cert. denied,* 474 U.S. 844, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985); *Wallpaper Mfrs., Ltd. v. Crown Wallcovering Corp.,* 680 F.2d 755, 766 n. 13 (C.C.P.A.1982) ("[f]rom the legislative history it is evident that abandonment under part (b) [subsection 1127(2) ] was principally intended to encompass acts of omission or commission by the registrant which resulted in the mark becoming a generic term") (citation omitted). This statutory directive reflects the policy considerations which underlie the naked licensing defense: "[i]f a trademark owner allows licensees to depart from his quality standards, the public will be misled, and the trademark will cease to have utility as an informational device ... [a] trademark owner who allows this to occur loses his right to use the mark." *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.,* 549 F.2d 368, 387 (5th Cir.1977). Conversely, if a trademark has not ceased to function as an indicator of origin there is no reason to believe that the public will be misled; under these circumstances, neither the express declaration of Congress's intent in subsection 1127(2) nor the corollary policy considerations which underlie the doctrine of naked licensing warrant a finding that the trademark owner has forfeited his rights in the mark.

Oxxford, pointing to recent precedent in this Circuit indicating that naked licensing results in an "involuntary trademark abandonment," posits that when a defendant proves that the trademark owner has licensed its mark without any quality control provisions the courts should *presume* a loss of significance. *See Moore Business Forms,* 960 F.2d at 489; *Taco Cabana International,* 932 F.2d at 1121. We disagree. Abandonment due to naked licensing is "involuntary" because, unlike abandonment through non-use, referred to in subsection 1127(1), an intent to abandon the mark is expressly not required to prove abandonment under subsection 1127(2). *See* 2 McCarthy, § 18:48;

*Conagra, Inc. v. Singleton,* 743 F.2d 1508 (11th Cir.1984); *Engineered Mechanical Services,* 584 F.Supp. at 1158. In addition, a trademark owner's failure to pursue potential infringers does not in and of itself establish that the mark has lost its significance as an indicator of origin. *Babbit Elecs., Inc. v. Dynascan Corp.,* 38 F.3d 1161, 1180 (11th Cir.1994) (per curiam affirmance incorporating district court's memorandum opinion via appendix); *Sweetheart Plastics, Inc.,* 743 F.2d at 1047-1048; *Wallpaper Mfrs., Ltd.,* 680 F.2d at 761-766; *United States Jaycees v. Philadelphia Jaycees,* 639 F.2d at 139-140. Instead, such a dereliction on the part of the trademark owner is largely relevant only in regard to the "strength" of the mark; absent an ultimate showing of loss of trade significance, subsection 1127(b)(2) (and the incorporated doctrine of naked licensing) is not available as a defense against an infringement suit brought by that trademark owner. *See* 2 McCarthy, § 17:17. We, like the district court, would find it wholly anomalous to *presume* a loss of trademark significance merely because Exxon, in the course of diligently *protecting* its mark, entered into agreements designed to preserve the distinctiveness and strength of that mark. We decline Oxxford's invitation to judicially manufacture a presumption of loss of trademark significance under the facts of this case given that had Exxon simply ignored the prior threats to its marks no such presumption would obtain.[13]

With the applicable legal standard clarified, we turn to the record before us. Exxon, commensurate with its burden under Rule 56, directed the district court's attention to Oxxford's failure to meaningfully address what is an essential component of its third-party naked licensing defense, *i.e.,* a loss of trademark significance in Exxon's mark(s). Even were we to construe

---

[13]The alternative to the phase out agreements latent in Oxxford's argument is that Exxon either ignore or immediately and relentlessly litigate with all perceived infringers. Unless Exxon were able to perfunctorily obtain preliminary injunctions against these parties, one must wonder whether, given the delays which are part of conventional civil litigation between entrenched corporate opponents, any resultant consumer confusion might well be abated more rapidly than under the phase out agreements. We further observe that a number of treatises and cases either explicitly or implicitly recognize that such agreements are often an appropriate manner in which to resolve trademark disputes. *See, e.g.,* Siegrun D. Kane, *Trademark Law 200* (2d ed.1991); *Minnesota Pet Breeders, Inc. v. Schell & Kampeter, Inc.,* 41 F.3d 1242, 1244 (8th Cir.1994); *Home Shopping Network, Inc. v. Happy Mind, Inc.,* 931 F.2d 886, 1991 WL 68834 (4th Cir.1991) (unpublished disposition); *Oreck Corp. v. U.S. Floor Systems, Inc.,* 803 F.2d 166, 168 (5th Cir.1986), *cert. denied,* 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987).

Oxxford's pleadings to allege the unlikely proposition that Exxon's registered marks, due to these third-party phase out agreements, have lost their distinctiveness as indicators of origin, Oxxford has offered absolutely no evidence to substantiate such a claim. Accordingly, we affirm the district court's ruling because Oxxford has failed to adduce evidence sufficient to allow a reasonable factfinder to conclude that Exxon has abandoned its marks.

II. Tarnishment-Dilution Counterclaim

We turn next to the district court's dismissal of Oxxford's tarnishment-dilution counterclaim. Oxxford's counterclaim, like Exxon's remaining claim, seeks relief under section 16.29 of the Texas Business and Commerce Code:

> **§ 16.29. Injury to Business Reputation or Trade Name or Mark**
>
> A person may bring an action to enjoin an act likely to injure a business reputation or to dilute the distinctive quality of a mark registered under ... Title 15, U.S.C .... regardless of whether there is competition between the parties or confusion as to the source of goods or services.

The Texas statute, like that of twenty-five other states, including California, Illinois, and New York, is based upon language contained in Section 12 of the 1964 United States Trademark Association Model State Trademark Bill. 3 McCarthy, § 24:80, P. 24-125. As one court has already noted, the Texas statute tracks in particular the language of the New York dilution statute, New York Gen.Bus.L. § 368-d. *See Pebble Beach Co. v. Tour 18 I, Ltd.,* 942 F.Supp. 1513, 1563 n. 46 (S.D.Tex.1996). Accordingly, owing to the dearth of case law interpreting section 16.29, we remain mindful of the general law of dilution, that body of common principles which has evolved in those jurisdictions possessing statutes derived from the USTA's model bill, in construing the Texas statute.

Under section 16.29, a plaintiff may seek an injunction to remedy ongoing dilution of a protected trademark even if it is not in business competition with the defendant(s) and irrespective of the existence *vel non* of any likelihood of consumer confusion. The owner of a distinctive mark[14]

---

[14]"It is clear that anti-dilution statutes ... are designed to protect only strong, well-recognized marks." *Accuride International, Inc. v. Accuride Corp.,* 871 F.2d 1531, 1539 (9th Cir.1989) (citations omitted). *See also Deere & Co. v. MTD Products, Inc.,* 41 F.3d 39, 42 (2d Cir.1994) (to prevail on dilution claim under New York law "a plaintiff must prove, first, that its trademark either is of truly distinctive quality or has acquired secondary meaning") (citation omitted). Our disposition of this case renders unnecessary a consideration of Oxxford's contention that the

may obtain relief under an anti-dilution statute if there is a "likelihood of dilution" due to 1) "blurring," a diminution in the uniqueness and individuality of the mark, or 2) "tarnishment," an injury resulting from another's use of the mark in a manner that tarnishes or appropriates the goodwill and reputation associated with the plaintiff's mark.[15] 3 McCarthy, §§ 24:67-69; *The Sports Authority, Inc. v. Prime Hospitality Corp.,* 89 F.3d 955, 965-966 (2d Cir.1996). Oxxford does not claim that Exxon's activities have "blurred" its "Oxxford" mark; rather, the only issue raised by Oxxford's pleadings and brief is a claim of dilution by tarnishment due to the purported link between the "Oxxford" mark and Exxon's alleged corporate reputation of greed and environmental destructiveness. *Pebble Beach Co.,* 942 F.Supp. at 1565-1567.

We consider first Oxxford's contention that the district court erred by finding its claim barred

---

district court erred in finding that "Oxxford" was not a distinctive mark. *See, however, Service Merchandise Co. v. Service Jewelry Stores, Inc.,* 737 F.Supp. 983 (S.D.Tex.1990) (applying Texas dilution statute court finds that existence of 226 registered service marks beginning with "service" and fact that 37 jewelers nationwide use "service" in their trade name does not render mark "Service Merchandise" weak). Nor do we have cause to discuss the district court's finding that Oxxford failed to make a "threshold showing of some mental association between the protected mark and the alleged diluter." *Fruit of the Loom, Inc. v. Girouard,* 994 F.2d 1359, 1363 (9th Cir.1993). *See also* 3 McCarthy, § 24:70; *L.L. Bean, Inc. v. Drake Publishers, Inc.,* 811 F.2d 26, 31 (1st Cir.) (association between L.L.Bean catalogue and "L.L. Beam's Back-to-School Sex Catalogue" tarnished former's business reputation), *cert. denied,* 483 U.S. 1013, 107 S.Ct. 3254, 97 L.Ed.2d 753 (1987); *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 205 (2d Cir.1979) (movie "Debbie Does Dallas" found to tarnish business reputation of Dallas Cowboy Cheerleaders). Both *L.L. Bean* and *Dallas Cowboys Cheerleaders, Inc.* involved a situation in which the complaining party's "trademark is used without authorization in a context which diminishes the positive association of the mark." *L.L. Bean,* 811 F.2d at 31. There is no claim here that Exxon makes any use of Oxxford's trademark. Moreover, in these cases the offending party was attempting to benefit----albeit by way of parody----from the plaintiff's mark and its public recognition. Nothing of the kind is asserted here.

[15]Some courts have found a third manner in which "likelihood of dilution" may be proven under certain state statutes, namely an injury to the value of the mark caused by actual or potential consumer confusion. *See Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.,* 828 F.2d 1482, 1489 (10th Cir.1987); *L.L. Bean, Inc. v. Drake Publishers, Inc.,* 811 F.2d 26, 30 (1st Cir.), *cert. denied,* 483 U.S. 1013, 107 S.Ct. 3254, 97 L.Ed.2d 753 (1987). *See also Deere & Co.,* 41 F.3d at 44 ("[b]ut the blurring/tarnishment dichotomy does not necessarily represent the full range of uses that can dilute a mark under New York law") (citations omitted). The Texas statute we consider, while it expressly declares that consumer confusion is not a prerequisite to the cause of action it creates, does not clearly indicate whether a cause of action premised upon actual or potential consumer confusion alone falls under its aegis. *See* 3 McCarthy, § 24:70 (discussing differences between dilution and likelihood of confusion standard). Our resolution of this case does not require us to answer this question, and thus we merely note it in passing.

by laches.[16]  Under Texas law the two elements of laches are "(1) unreasonable delay by one having legal or equitable rights in asserting them;  and (2) a good faith change of position by another to his detriment because of the delay."  *Rogers v. Ricane Enterprises, Inc.,* 772 S.W.2d 76, 80 (Tex.1989).[17]  *See also Gulf, Colorado & Santa Fe Ry. Co. v. McBride,* 159 Tex. 442, 322 S.W.2d 492, 500 (1958) (laches results from "an unreasonable delay which has worked injury to another person") (citations omitted).  Because laches is an equitable doctrine, courts typically look at the interval between the time plaintiff obtained actual or constructive knowledge of the asserted invasion of its rights and the time suit was filed in determining whether a plaintiff's delay in bringing suit was unreasonable.  *Armco, Inc. v. Armco Burglar Alarm Co.,* 693 F.2d 1155, 1161 (5th Cir.1982) (construing Texas law);  *City of Houston v. Muse,* 788 S.W.2d 419, 422 (Tex.App.—Houston [1st Dist.] 1990).

Oxxford claims that its cause of action did not accrue until it suffered "reputational injury," in this case "at the moment that Exxon's reputation became unsavory enough to affect Oxxford." Oxxford, relying upon the affidavit of one of its corporate officers, contends that its cause of action did not accrue until the Exxon Valdez verdict and attendant public outcry in late 1994.  Noting that it could not have sued Exxon under section 16.29 prior to 1989, when the Texas statute was enacted, Oxxford concludes that Exxon's laches defense should fail because it cannot fix a date certain upon

---

[16]Exxon claims that the material facts relevant to laches are undisputed and therefore review is more properly conducted under an abuse of discretion standard.  *National Ass'n of Gov't Employees v. City Pub. Serv. Bd.,* 40 F.3d 698, 707 (5th Cir.1994).  Given the summary judgment context below, we review the record *de novo* to determine what facts material to the laches issue are not subject to genuine dispute;  based on those facts, we review the district court's lache's ruling under an abuse of discretion standard.  *Id.*

[17]Some Texas courts have also noted, albeit usually in the context of laches asserted within the statutory limitations period, that as a general rule laches is inappropriate when the controversy is one governed by a statute of limitations.  *See, e.g., Stevens v. State Farm Fire & Cas. Co.,* 929 S.W.2d 665, 672 (Tex.App.—Texarkana 1996).  Although not briefed by the parties, it seems probable that Texas' four year statute of limitations could apply in this case.  Tex. Civ. Prac. & Rem.Code § 16.004;  *First Nat. Bank of Eagle Pass v. Levine,* 721 S.W.2d 287 (Tex.1986). Texas courts have also held, however, that in actions like that Oxxford asserts here, seeking injunctive relief for ongoing harm to a trademark, the continuous tort doctrine halts the running of the statute of limitations.  *Thompson v. Thompson Air Conditioning & Heating, Inc.,* 884 S.W.2d 555, 560-561 (Tex.App.—Texarkana 1994) (common law trade name infringement action not barred by statute of limitations).  In such a circumstance, consideration of the equitable laches of doctrine is appropriate.  *Id.*

which Oxxford became aware of the existence of an actionable dilution claim.

The record reflects, without dispute, assertions by Oxxford executives as early as 1972 that the mark "Exxon" could possibly influence the distinctiveness and corollary goodwill of their "Oxxford" mark.[18]  In addition, Oxxford's final pleadings relate actions of Exxon stretching back to 1973 in an attempt to establish its tarnishment cause of action, declaring that "[a]s early as 1973, the Exxon name stood for greed and dishonesty."  The bulk of Oxxford's allegations dwell upon Exxon's activities in the late 1970s through the Exxon Valdez incident in 1989, only reaching the 1994 Valdez verdict by way of conclusion.  Oxxford failed to bring its claim in the six years preceding this lawsuit, after the Texas cause of action became available.  Moreover, Illinois, where Oxxford was headquartered in 1972 and still has its principal place of business, has had an anti-dilution statute since 1956.  Ill. Stat. ch. 765, § 1035/15.

Under these uncontroverted facts, the district court did not abuse its discretion in concluding there had been an unreasonable delay in bringing suit, thus satisfying the first prong of Texas' laches inquiry.  Regarding the second prong of this test, the record is undisputed that Exxon, relying upon the federal registration of its marks and its strict policing of similar marks, accrued tremendous investment costs and resultant goodwill in the challenged marks while Oxxford remained quiescent.  Given this record, we affirm the ruling of the district court that Oxxford's claim is barred by laches.

We further observe that even were Oxxford's claim not barred by laches, it would plainly be an exercise in futility to remand the counterclaim, because Oxxford's pleadings do not state a cause of action under Texas' dilution statute.[19]  Oxxford observes in its brief to this Court that it has long

---

[18]Exxon contends, and Oxxford does not dispute, that Oxxford Clothes XX, Inc., is bound by the knowledge of its predecessor-in-interest, Oxford Clothes, Inc. *See* note 2, *supra; Vincent Murphy Chevrolet Co., Inc. v. United States,* 766 F.2d 449, 451 (10th Cir.1985);  *Charvet S.A. v. Dominique France, Inc.,* 568 F.Supp. 470, 474 (S.D.N.Y.1983), *aff'd,* 736 F.2d 846 (2d Cir.1984).

[19]It is well-established that this Court may affirm a summary judgment on any grounds supporting such a ruling which are manifest in the record. *Rizzo v. Children's World Learning Centers, Inc.,* 84 F.3d 758, 762 (5th Cir.1996).  This includes grounds which have been rejected or not addressed by the district court.  *Kiser v. Garrett,* 67 F.3d 1166 (5th Cir.1995).  Although Exxon did not file a motion to dismiss Oxxford's counterclaim under Fed. R. Civ. Proc. 12(b)(6), the insufficiency of the anti-dilution claim was broached in Exxon's summary judgment pleadings, was explicitly renewed in its brief to this Court, and involves only a question of law.

"enjoyed an outstanding reputation as a hand-made men's suit manufacturer" and "in the American apparel market, Oxxford has remained ... the epitome of quality in U.S.-made men's business clothing." Oxxford's brief goes on to state that "[t]he essence of Oxxford's counterclaim is that ... Exxon's destruction of the environment and other corrupt business practices have lowered its esteem in the public's eye to the point that its reputation, coupled with the association of its mark with Oxxford's, is tarnishing the reputation of Oxxford." The Texas statute, however, affords a plaintiff a remedy only for those "acts" which threaten dilution of a valid trademark.[20] We must perforce consider which "acts" give rise to a colorable dilution by tarnishment claim under the Texas statute. *See* 3 McCarthy, §§ 24:104-107 (discussing different modes of tarnishment, including parody and competitive advertising, and listing cases); *Hormel Foods Corp. v. Jim Henson Productions, Inc.,* 73 F.3d 497, 507 (2d Cir.1996) (same); *Anheuser-Busch, Inc. v. Balducci Publications,* 28 F.3d 769, 777 (8th Cir.1994) (same); *Jordache Enterprises, Inc.,* 828 F.2d at 1490 (same).

Oxxford seeks, through the vehicle of section 16.29 and a flimsy, attenuated assertion that there is an ease of association between the marks "Oxxford" and "Exxon," to hold Exxon responsible for all activities and events within the last twenty-five years falling under its corporate aegis and resulting in general negative publicity for the corporation. Such an approach ignores the distinction between the use of the appellation "Exxon" as a device of corporate identity and its use as a *trade* name or *trademark, i.e.,* as an indicator of origin and/or quality of particular goods and services. The "acts" which comprise the basis of Oxxford's claim, such as the Exxon Valdez spill and resulting jury verdict, bear no relationship to the quality or reputation of the products sold or services provided

---

[20]The Texas statute, like the model bill, states that in addition to enjoining trademark dilution a plaintiff may enjoin acts likely to injure business reputation. It is unclear whether this language creates a separate cause of action or merely expresses the "tarnishment" prong of the typical dilution cause of action. "While the statute speaks in terms of protecting against two distinct harms—injury to business reputation and dilution of a mark's distinctive quality—the first harm has consistently been deemed subsumed into the second." *Plasticolor Molded Products v. Ford Motor Co.,* 713 F.Supp. 1329, 1342 (C.D.Cal.1989) (citation omitted), *vacated on other grounds,* 767 F.Supp. 1036 (C.D.Cal.1991). *See Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977). Texas already recognizes a common law cause of action for business disparagement, the elements of which are publication of disparaging words, falsity, malice, lack of privilege, and special damages. *Hurlbut v. Gulf Atlantic Life Ins. Co.,* 749 S.W.2d 762, 766 (Tex.1987) (citations omitted). Obviously, no such cause of action is asserted, or even sought to be asserted, here.

under cover of Exxon's marks (or to the quality or reputation of products sold or services provided under Oxxford's marks).

What Oxxford seeks by its counterclaim is to enjoin Exxon from using Exxon's registered marks. Section 16.29 is, at least in most respects, a garden variety dilution statute, and we have uncovered no authority even suggesting that a dilution by tarnishment claim brought under such a statute which seeks to *enjoin* the defendant's *use of its mark* can be premised upon matters wholly unrelated to the defendant's use of the allegedly diluting mark *as a trademark* (or to any use of or attempt to benefit from plaintiff's trademark).[21] Under Oxxford's theory, rights in an otherwise established, valid, and registered trademark which continue to nonconfusingly reflect to the public the origin and quality of the goods in connection with which it is used, may be lost merely because the mark's owner has incurred a bad public reputation in respect to matters unrelated to the quality of its products. In fine, the trademark owner has a property right in his mark, but only so long as he personally is not unpopular with the general public. We reject this highly unorthodox view of trademark law. Therefore, even if we assume *arguendo* that Oxxford is a sufficiently strong mark to warrant protection under the Texas statute and that "Exxon" and "Oxxford" are similar enough to allow the public to make some attenuated subliminal association between the products and services offered under the two marks, we nonetheless conclude that Oxxford's allegations, because they do not assert that some manner of deficiency or unsavoriness inures to the products or services sold under Exxon's registered marks or that Exxon has infringed or attempted to benefit from Oxxford's marks, do not state a cause of action under Tex.Bus. & Comm.Code § 16.29.

---

[21]Oxxford relies upon several cases in which courts have found that uses of a similar mark which undermine the quality assurance of the plaintiff's mark can result in tarnishment. *See Tiffany & Co. v. Boston Club, Inc.,* 231 F.Supp. 836, 844 (D.Mass.1964); *Steinway & Sons v. Robert Demars & Friends,* 210 U.S.P.Q. 954, 964 (C.D.Cal.1981). In *Tiffany & Co.,* a New York retail store of that name brought an infringement and dilution claim against a Boston Corporation which was using "Tiffany" in the name of its restaurant and lounge. In *Steinway & Sons,* the owners of the prestigious Steinway (piano) mark claimed that the maker of the "Stein-way clip-on beer handles" was diluting their mark. Both of these cases concern the negative associations which developed out of the defendant's use of trademarks similar to those of the plaintiff on products which were markedly less ornate, sophisticated, or elegant than the plaintiff's products. These cases, which involve the *defendant's use of an allegedly similar mark on its products in commerce,* merely reiterate the proposition we propound above.

The district court did not err in dismissing Oxxford's counterclaim.[22]

## Conclusion

The district court did not err by rejecting Oxxford's defenses or by dismissing Oxxford's counterclaim, and those rulings are AFFIRMED.

---

[22]We need not reach Exxon's contentions that Oxxford's asserted cause of action necessitates a retroactive application of the anti-dilution statute contrary to the legislature's intent and is in any case forbidden by the Texas and federal constitutions.